**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
----------------------------------X
NICOLE PAPPAS,                     :
                                   :
         Plaintiff,                :
                                   :
              v.                   :    No. 3:04-CV-304 (EBB)
                                   :
WATSON WYATT & CO.                 :
                                   :
         Defendant.                :
----------------------------------X
```

RULING ON DEFENDANT'S MOTIONS FOR DIRECTED VERDICT

INTRODUCTION

Plaintiff Nicole Pappas ("Pappas") brought this action against defendant Watson Wyatt & Co. ("Watson Wyatt") claiming that Watson Wyatt had retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(4). At trial, after the plaintiff's case, Watson Wyatt moved to strike punitive damages and moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). (See Doc. No. 92.) The Court reserved decision. At the end of the trial, before the case was submitted to the jury, Watson Wyatt again moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). (See Doc. Nos. 98, 99.) The Court again reserved decision. On December 18, 2006, the jury found for Pappas on her retaliation claims and awarded her compensatory damages but declined to award punitive

1

damages.  For the following reasons, the defendant's motions are DENIED.

FACTUAL BACKGROUND

Nicole Pappas was employed as an Account Manager at Watson Wyatt's Stamford, Connecticut offices from November 2002, until she was discharged on May 5, 2003.  Watson Wyatt is an international human resources consulting firm.  (Tr. 12/13/06 at 58.)  Pappas is a licensed attorney who, prior to joining Watson Wyatt, had several years of work experience which included practicing law, working in human resources and staff development, and running her own consulting firm.  (Id. at 54-58.)

During her employment at Watson Wyatt, Pappas reported to Scott Russell, who also worked at the Stamford office.  (Id. at 64.)  Pappas often found that Russell's workplace behavior toward her made her uncomfortable.  She testified about the following examples of Russell's conduct:

- Russell repeatedly invited her to his home and to see the jewelry that his wife's company sold.  (Id. at 85.)  Despite Pappas' having repeatedly declined these invitations, Russell also invited her to his weekend ski house in Vermont.  (Id.)

- Around Christmas, after inviting Pappas into his office and closing the door, Russell gave her a pearl necklace.  (Id. at 89.)  He told her that it was against company policy to give gifts, that he was not giving gifts to any other employees, and that she should

2

not tell anyone about the gift.  (Id.)

- Russell spent excessive amounts of time in her office with no business purpose and watched her as she worked.  (Id. at 95-96.)

- Russell made sure that Pappas included her photograph in the materials she sent to prospective clients.  (Id. at 86-87.)  When one prospective client did not reply, Russell expressed disbelief that the client had not replied despite having seen Pappas' photograph.  (Id.)

- On a number of occasions, Russell left gifts such as stickers and horoscopes in Pappas' office.  (Id. at 97-98.)

- Russell told Pappas that he was not taking her to meet with a particular client because the client found attractive women threatening.  (Id. at 93-94.)

- Russell suggested that Pappas call a prospective client, tell him she was having a rough day, and suggest they go out for a drink.  (Id. at 96-97.)

- Russell called Pappas to arrange an urgent early-morning meeting between the two of them but then was unable to explain why the meeting was necessary.  (Id. at 100-101.)

- When Pappas began to avoid Russell, he told that she needed to be in the office more often and falsely told her that supervisors were complaining about her absences.  (Id. at 183.)

- Russell told another female employee that she should not go to an out-of-town convention because it would require her to be

away from her young child. (Id. at 100.)

- On more than one occasion, Russell referred to another Watson Wyatt female employee as "dikey." (Id. at 80, 88.)

- When Pappas asked for Russell's opinion about a particular consultant, he told her that "everybody [knew]" the consultant was "a lesbian." (Id. at 99.)

- Russell referred to a male Watson Wyatt employee as a "prissy" and a "pansy." (Id. at 94-95.)

Pappas interpreted Russell's behavior toward her as an expression of his romantic interest and believed that this conduct constituted sexual harassment and/or discrimination. (Id. at 117-18, 215.) Pappas testified that she spoke to two co-workers about these incidents but that they advised her to keep her complaints about Russell's conduct to herself. (Id. at 110.)

Pappas received excellent performance reviews for her work at Watson Wyatt prior to her termination. (Pl.'s Ex. 1.) Watson Wyatt's managers decided, based on Pappas' performance, that it would be appropriate to transfer her to its New York office, where she would face more challenging opportunities. (Tr. 12/13/06 at 115-16, 159.) Pappas was initially resistant to the idea of moving to New York, but, according to her testimony, she later changed her mind and decided to explore a possible transfer so that she would not have to continue to work with Russell. (Id. at 110-13.) In April 2003, Pappas met with Andy Marut, the Director of Account

Management based in New York, about her transfer. Marut told her that the transfer had been more or less finalized and that they merely needed to work out the date when it would become effective. (Id. at 116.)

During the meeting, Marut asked Pappas for her impressions of Russell. (Id. at 116-17.) Pappas told Marut about all of the incidents involving Russell listed above. (Id. at 117.) Marut was apologetic and told Pappas that, as a result of his experience with Russell, he was not surprised by her complaints. (Id.) The following day, Ted Nussbaum, head of the Stamford office, contacted Pappas to discuss her complaints. (Id. at 119.) Pappas testified that Nussbaum also was apologetic and told her that there had been earlier incidents involving inappropriate behavior on Russell's part. (Id. at 119-21.) Pappas testified that Nussbaum told her that her complaints would not affect her transfer to New York. (Id. at 121.)

Pappas testified that she became alarmed because, after speaking with Nussbaum, she received multiple phone calls from Russell. (Id. at 121.) In particular, Pappas became concerned about retaliation after Russell left a voice mail informing Pappas that she had violated the company vacation policy and that they needed to meet to discuss a number of "serious issues." (Id. at 121.) Pappas called Nussbaum and told him she had hoped Nussbaum would keep her complaints confidential and that she was afraid of

Russell. (Id. at 122.) Nussbaum told Pappas that she could report directly to him and that she could work from home or from the New York office so as to avoid contact with Russell. (Id.)

Susan Oehlsen, the head of human resources at Watson Wyatt's Stamford office, then met with Pappas and told her that she was going to conduct an investigation into Russell's behavior. (Id. at 123.) A few days later, Oehlsen told Pappas that she had informed Russell of her complaints about him and that Russell contested Pappas' version of events. (Id. at 124.) Oehlsen then told Pappas that Pappas was to attend a meeting with Kathy Davi, who was the national head of human resources, Marut, Nussbaum, Oehlsen, and Russell. (Id.) Pappas told Oehlsen that she thought it was unfair that she was required to confront Russell at such a meeting. (Id.) Pappas then contacted Marut, who told her that her transfer to New York was "on hold" pending the outcome of the meeting. (Id. at 129.)

Pappas then sent an email to the individuals involved in the investigation. (Pl.'s Ex. 30.) In her email, Pappas refused to attend the meeting and explained that she was uncomfortable meeting with Russell and that she was concerned about retaliation. (Id.) During a subsequent telephone conversation, Oehlsen told Pappas that the purpose of the meeting was for Pappas and Russell to "hash . . . out" their differences. (Tr. 12/13/06 at 132.) Pappas reiterated to Oehlsen her refusal to attend a meeting with Russell.

(Id.) Nussbaum then called Pappas and told her that her attendance at the meeting was "not voluntary." (Id. at 133.) When Pappas again refused to participate in a meeting with Russell, Nussbaum told her that he was firing her for insubordination. (Id.)

DISCUSSION

I. RULE 50(a)

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). Because a judgment as a matter of law intrudes upon the rightful province of the jury, it is highly disfavored. The Second Circuit has emphasized that, in ruling on such a motion, a court is "required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001) (citing Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1998)); see also Luciano v. Olsten Corp., 110 F.3d 210, 214-15 (2d Cir. 1997); EEOC v. Ethan Allen, Inc., 44 F.3d 116, 119 (2d Cir. 1994). The Court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." Tolbert, 242 F.3d at 70 (quoting Smith, 861 F.2d at 367). A jury verdict should be

set aside only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 79 (2d Cir. 2006) (internal citations omitted).

II. TITLE VII

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [such employee] has opposed any practice made an unlawful employment practice by this [title], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title]." 42 U.S.C. § 2000e-3(a). The parties agree that the law governing the plaintiff's CFEPA retaliation claim is virtually identical to the law governing her Title VII retaliation claim.

Title VII retaliation claims are evaluated under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995). Under this three-part analysis

> (1) plaintiff must demonstrate a prima facie case of retaliation, (2) defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the complained of action, and (3), if the defendant meets its burden, plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the

> proffered legitimate reason merely a pretext for impermissible
> retaliation

Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998). Although
there is a shifting burden, "[t]he ultimate burden of persuading
the trier of fact that the defendant intentionally discriminated
against the plaintiff remains at all times with the plaintiff."
Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)
(citing Board of Trustees of Keene State College v. Sweeney, 439
U.S. 24, 25, n.2 (1978)).

A.    Prima Facie Case

To establish a prima facie case of retaliation, the plaintiff
must show 1) that she was engaged in an activity protected under
Title VII, 2) that her participation in the protected activity was
known to the defendant employer, 3) that the defendant took adverse
action against her, and 4) that there exists a causal connection
between the plaintiff's protected activity and the adverse action
taken by the defendant. Cifra v. G.E. Co., 252 F.3d 205, 216 (2d
Cir. 2001) (quoting Sumner v. United States Postal Service, 899
F.2d 203, 208-09 (2d Cir. 1990)); Tomka, 66 F.3d at 1308. The
plaintiff's burden at the prima facie stage is "de minimus."
Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988).

It is undisputed that Pappas' termination from her job at
Watson Wyatt constitutes an adverse employment action. However,
the defendant contends that Pappas has failed to establish the
other three elements of her prima facie retaliation case.

i.  <u>Protected Activity</u>

Title VII protects employees who make "informal protests of discrimination," as well as employees who file formal complaints. <u>Matima v. Celli</u>, 228 F.3d 68, 78 (2d Cir. 2000).  To establish that she was engaged in protected activity, Pappas need not show that the conduct she opposed in fact violated Title VII, but only that she had a reasonable, good faith belief that the conduct was unlawful.  <u>Sumner</u>, 899 F.2d at 209 (2d Cir. 1990).  <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 769 (2d Cir. 1998).  "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances."  <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276, 292 (2d Cir. 1998) (citing <u>Reed v. A.W. Lawrence & Co.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996)).

Watson Wyatt argues that the complaints Pappas expressed to the Watson Wyatt managers regarding Russell's conduct do not describe sexual harassment or discrimination and, therefore, the conduct Pappas opposed was not unlawful.  Watson Wyatt claims that Russell's conduct was not "gender-specific" or "sex-related" and, therefore, could not constitute discrimination or harassment. (<u>See</u> Def.'s Mot. for Directed Verdict at 8-11.)  However, as Pappas points out, it is not so clear that Russell's attention toward her did not constitute harassment or create a hostile work environment in violation of Title VII.  (<u>See</u> Pl.'s Mem. in Opp. at 6-8.)  Courts have held that where excessive attention shown by a manager

to a subordinate could be interpreted as expression of the manager's romantic or sexual interest, reasonable jurors could conclude that the manager's conduct created a sexually hostile work environment. See, e.g., Gallagher v. Delaney, 139 F.3d 338, 343-5, 347-48 (2d Cir. 1998) (holding that summary judgment should not be granted for the defendant in a case in which the plaintiff claimed that she was subjected to a hostile work environment after her superior repeatedly gave her gifts and notes, commented on her physical appearance, asked her personal questions, and invited her to lunch and to Atlantic City); Ackerman v. National Financial Systems, 81 F. Supp. 2d 434, 435, 438 (E.D.N.Y. 2000) (denying defendant's motion for summary judgment on harassment claim where plaintiff's superior was "overly friendly," sent her cards and gifts, was constantly around her, took her on a trip, and made "suggestions of a more intimate relationship").

More importantly, Pappas need not establish that she was harassed or discriminated against in violation of Title VII, but only that she had a reasonable, good faith belief that her complaints to Watson Wyatt's managers about Russell's conduct were complaints of harassment. See, e.g., Shepard v. Frontier Communications Serv., Inc., 92 F. Supp. 2d 279, 288-91 (S.D.N.Y. 2000) (finding that the plaintiff had failed to establish a prima facie case of sexual harassment but finding nonetheless that she had held a good faith, reasonable belief that she was complaining

about sexual harassment). Pappas testified that she believed that Russell's conduct constituted sexual harassment because she viewed his conduct as being related to a "romantic interest" and as "more than just your boss being professional with you." (Tr. 12/13/06 at 118.) Such a belief is not unreasonable given the interpretations of Title VII set forth in the opinions cited in the preceding paragraph. Pappas also testified that she believed that Russell's comments about other employees were "discriminatory and homophobic." (Id.) This belief was also reasonable since courts have held that offensive remarks and behavior directed at others can contribute to the overall hostility of a working environment. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 n.9 (2d Cir. 2000) (citing Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)).

Therefore, due to the nature of the conduct about which Pappas complained, the jury could reasonably have concluded that Pappas reasonably and in good faith believed that she was engaged in protected activity. See, e.g., Reed, 95 F.3d at 1179-80 (affirming trial court's denial of the defendant's Rule 50 motion and holding that the plaintiff reasonably believed that she was subjected to a hostile work environment on the basis of two sexual comments by male co-workers in conjunction with plaintiff's perception that her male co-workers did not give her credit for her work and treated her as a subordinate).

Contrary to Watson Wyatt's contentions, it makes little difference to Pappas' prima facie case that she did not initiate a formal complaint regarding Russell's conduct. Watson Wyatt argues that this fact demonstrates that Pappas did not, at the time, believe she was complaining about harassment or discrimination. (See Def.'s Mot. for Directed Verdict at 12; Def.'s Reply at 4). However, Pappas explained her failure to file a formal complaint when she testified that she did not complain about Russell's conduct because two co-workers advised her to keep her complaints to herself. (Tr. 12/13/06 at 110.) Furthermore, the law does not require Pappas to have initiated a formal complaint procedure or have reported her concerns in any particular manner. Rather, in enacting the anti-retaliation provisions in Title VII, "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." DeWitt v. Lieberman, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999) (quoting Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1569 (2d Cir. 1989)); see, e.g., Shepard, 92 F. Supp. 2d at 291 (finding that complaints to a supervisor about another manager's inappropriate behavior constitute protected activity).

Watson Wyatt also makes much of the fact that Pappas did not, when reporting Russell's conduct to Marut and other Watson Wyatt managers, use the words "sexual harassment" or "discrimination." (See Tr. 12/13/06 at 187.) Watson Wyatt argues that Pappas'

failure to use these terms indicates that she did not, in fact, believe that she was reporting unlawful activity but was, rather, simply voicing her general concerns about Russell's management style. The defendant also points out that Pappas told the Watson Wyatt decision-makers in her email that she had "not raised a claim against Watson Wyatt or Scott Russell" and that she was "merely relaying [her] concerns" in response to Marut's inquiries about "the functioning and management of the Stamford office." (See Pl.'s Ex. 30.) Watson Wyatt argues that a person with Pappas' training and experience in legal and human resources issues would have been more explicit about the nature of her complaint had she genuinely believed that she was engaged in protected activity.

However, as the Court has already ruled in denying Watson Wyatt's motion for summary judgment, a reasonable juror could conclude that Pappas' complaint about the excessive attention Russell paid her was a complaint of sexual harassment even though she did not explicitly describe it in those terms at the time. (See Recommended Ruling on Motion for Summary Judgment at 8.) Furthermore, in her testimony, Pappas explained why she did not initiate a formal complaint and explained why she told the Watson Wyatt managers that she "had not raised a claim." She testified that she wrote her email in ths manner because she did not want to appear threatening or confrontational. (Tr. 12/13/06 at 212.) Pappas had been informed that her transfer to New York was "on

hold" at that point, so it would have been reasonable for her to have tried to avoid doing or saying anything that might further jeopardize her transfer. The jury could have found this testimony to have been credible and accepted Pappas' explanation of why she attempted to take a less aggressive stance toward her employer while complaining about Russell's behavior. Pappas' testimony therefore provided a sufficient basis upon which the jury could have reasonably concluded that she did, in fact, believe that she was opposing unlawful activity.

ii.  Watson Wyatt's Awareness That Pappas Was Engaged in  
     Protected Activity

To satisfy the knowledge requirement at the prima facie stage, a plaintiff need only establish "general corporate knowledge that the plaintiff has engaged in a protected activity." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000). "[I]mplicit in [this] requirement . . . is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Galdieri-Ambrosini, 136 F.3d at 292.

Watson Wyatt argues that Pappas has failed to meet this requirement because the evidence shows that Watson Wyatt's managers thought they were investigating complaints about Russell's management style and were unaware that Pappas had complained about activity prohibited by Title VII. However, as the Court pointed out in its ruling denying Watson Wyatt's motion for summary

15

judgment, Watson Wyatt's reaction to Pappas' complaints is inconsistent with this contention. (See Recommended Ruling on Motion for Summary Judgment at 9.) Pappas testified that Marut was "very apologetic" when he heard about her experiences with Russell. (Tr. 12/03/06 at 118); that Nussbaum called her the next day and said he was "very concerned" and offered to meet with Pappas outside the office so that she would feel "more comfortable" (id. at 120); and that Oehlsen called her and told her that human resources was conducting an "investigation" into her "complaints and allegations" (id. at 123). Kathy Davi, Watson Wyatt's national head of human resources, was involved in the investigation. (Id. at 124.) In addition, Ohlsen testified that Watson Wyatt's general counsel was involved in the investigation. (Tr. 12/14/06 at 112.) An investigation of this sort suggests that the Watson Wyatt managers thought they dealing with something more than mere complaints about management style. The scale and nature of Watson Wyatt's reaction to Pappas' complaints therefore supports the inference that the defendant was aware that Pappas was engaged in protected activity.

The defendant's witnesses testified that they were unaware that Pappas' complaints related to harassment or discrimination. However, the jury was not required to believe these witnesses. Furthermore, the defendant's witnesses admitted that many of Pappas' complaints referred to conduct that they might view as

discriminatory. Davi testified that use of the terms "dyke" and "pansy" in a work environment might be "evidence of discrimination." (Tr. 12/13/06 at 245.)  She also testified that a situation in which a supervisor gave an employer an expensive gift and told the employee to keep quiet about it would "perhaps" be viewed as an instance of sexual harassment.  (Id.)  Oehlsen agreed with this assessment.  (Id. at 243; Tr. 12/14/06 at 129.)

iii. Causal Connection

"The causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" Cifra, 252 F.3d at 217 (quoting Reed, 95 F.3d at 1178 (2d Cir. 1996) (quoting Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988))); see also Quinn, 159 F.3d at 796.  The timing of Pappas' termination, which was less than two weeks after her complaint to Marut, is therefore sufficient to satisfy this prong of the prima facie case.[1]

The defendant argues that the record shows that Pappas was fired for insubordination, not in retaliation for engaging in

_____

[1]The defendant cites a number of cases suggesting that temporal proximity cannot, without more, demonstrate causation. (Def.'s Reply at 7.)  These cases all involve allegations of retaliation brought by prisoners and are not applicable in the context of assessing a Title VII plaintiff's prima facie case. See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (noting that the Second Circuit "examine[s] prisoners' claims of retaliation with skepticism and particular care") (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)).

protected activity, and, therefore, that she failed to establish causation. (Def.'s Mot. for Directed Verdict at 15-16.) However, the issue of why Pappas was fired more properly falls into the Court's discussion of whether there was a legitimate, non-retaliatory reason for Watson Wyatt's actions.

Bearing in mind that, while ruling on the defendant's motion, the Court is required to consider the evidence in the light most favorable to the plaintiff, and that the plaintiff's burden of proof at the prima facie stage is "not onerous," Burdine, 450 U.S. at 253, the Court finds that Pappas established a prima facie case of unlawful retaliation at trial.

B.  Legitimate, Non-Retaliatory Reason for Plaintiff's Termination

Because Pappas has demonstrated a prima facie case of retaliatory discharge, the burden shifts to Watson Wyatt to point to evidence that it terminated Pappas for some legitimate, non-retaliatory reason.  The defendant's burden at this stage is "light" and the "ultimate burden . . . rests on the plaintiff to persuade the factfinder that the employer's proffered explanation is merely a pretext for its intentional discrimination." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998).  To satisfy her burden, the plaintiff need not prove that the defendant's "proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating'

factors." Padilla v. Metro-North Commuter R.R., 92 F.3d 117, 122
(2d Cir. 1996) (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196,
203 (2d Cir. 1995) (quoting Price Waterhouse v. Hopkins, 490 U.S.
228, 247, 249 (1989))).

Watson Wyatt claims that it fired Pappas only because she
insubordinately refused to attend a mandatory meeting. However,
Pappas presented evidence suggesting that this explanation was a
pretext for retaliation. Prior to her complaints about Russell's
behavior, Pappas received excellent performance reviews for her
work at Watson Wyatt, and, as a result, Watson Wyatt had apparently
decided to transfer Pappas to its New York office, where she would
face more challenging assignments. According to Pappas' testimony,
when she initially related her complaints to various Watson Wyatt
managers, they apologized for Russell's behavior and indicated that
they would support her. Nussbaum told Pappas that Russell had
exhibited "inappropriate behavior" on previous occasions and that
he did not want a "C player" like Russell to "get in the way of an
A player" like Pappas. (Id. at 120-121.) Pappas testified that
Nussbaum assured her that her complaints would not affect her
transfer to New York. (Id.) Watson Wyatt's sudden decision to
fire Pappas simply because she would not attend a meeting with
Russell therefore seems to make little sense. Under these
circumstances, a jury might reasonably have concluded from the
absence of a logical explanation that the reason given for Pappas'

termination was a pretext for retaliation. See DeMarco v. Holy Cross High Sch., 4 F.3d 166, 171 (2d Cir. 1993) ("[A] plaintiff may be able to put into question the genuineness of the employer's putative non-discriminatory purpose by arguing that the stated purpose is implausible, absurd or unwise"); Stratton v. Dep't for the Aging for New York, 132 F.3d 869, 879 n.6 (2d Cir. 1997) ("Actions taken by an employer that disadvantage an employee for no logical reason constitute strong evidence of an intent to discriminate") (citing cases).

The explanations offered by Watson Wyatt's witnesses would not necessarily have been credited by a reasonable jury as legitimate, non-retaliatory reasons for Pappas' termination. Both Nussbaum and Oehlsen testified that it was important for Pappas and Russell to meet so that they could resolve their differences in order to continue to work together. (Tr. 12/14/06 at 112-13; Tr. 12/15/06 at 36.) The jury would have had good reason to discredit this explanation since Watson Wyatt was already planning to transfer Pappas to New York, where she would no longer need to work with Russell. Oehlsen also apparently told Pappas that it was Watson Wyatt's "best practice" to get the two parties to a complaint together in a room so that they could "hash it out," (Tr. 12/03/06 at 132), but Oehlsen also admitted that it was not Watson Wyatt's policy to require face-to-face meetings of this kind during the investigation of an employee's complaints about a supervisor. (Tr.

12/14/06 at 146.)  See DeMarco, 4 F. 3d at 171 (noting that the "pretext inquiry . . . normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules").

Oehlsen also admitted during her testimony that she began documenting certain concerns about Pappas' trustworthiness and past performance *after* learning of Pappas' complaints about Russell. (Tr. 12/14/06 at 139-45; 165.)  The jury may have inferred a retaliatory motive from the fact that these concerns of Oehlsen's related to previously undocumented, seemingly minor incidents that occurred well before Pappas complained about Russell.  Finally, the fact that Watson Wyatt managers allowed Russell himself to participate in the decision to fire Pappas suggests that a retaliatory motive played at least some role in the decision to terminate her employment.  (See Tr. 12/14/06 at 65.)

There was, therefore, sufficient evidence for the jury to have concluded reasonably that Pappas was fired in retaliation for having engaged in protected activity and to have concluded that the explanations offered by the defendant for her termination were pretext.

Finally, the Court notes that Pappas argues that Watson Wyatt's stated reason for firing Pappas was itself unlawful and therefore could not have constituted a legitimate, non-retaliatory reason for Pappas' termination.  Pappas argues that her opposition

to attending the meeting at which she would be forced to confront Russell was itself protected activity under Title VII and that Watson Wyatt violated Title VII when it fired her for this reason. (Pl.'s Mem. in Opp. at 16-21.)  Because the Court has found that a reasonable jury could have concluded that Watson Wyatt's purported legitimate, non-retaliatory reason for its action was a pretext for retaliation, the Court does not need to consider whether an employee's refusal to attend a meeting with the supervisor about whom she has complained constitutes protected activity under Title VII or the CFEPA.

CONCLUSION

For the foregoing reasons, the defendant's motions for judgment as a matter of law (Doc. Nos. 92, 98, 99) are DENIED. Insofar as the defendant moves to strike punitive damages (see Doc. No. 92), this motion is DENIED as moot.


SO ORDERED.


_____ /s/ _____
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE


Dated at New Haven, Connecticut this 20th day of March, 2008.